623 So.2d 270 (1993)
NATCHEZ EQUIPMENT COMPANY, INC. and Federated Mutual Insurance Company
v.
Charles H. GIBBS, as Executor of the Last Will and Testament of Martin Larsen, Deceased.
No. 90-CC-1245.
Supreme Court of Mississippi.
August 26, 1993.
*271 John S. Gonzalez and Donald V. Burch, Daniel Coker Horton & Bell, Jackson, for appellant.
John E. Mulhearn, Jr., Mulhearn & Mulhearn, Natchez, for appellee.
Before HAWKINS, C.J., and PITTMAN and BANKS, JJ.
BANKS, Justice, for the court:
Here we are confronted with a determination by the Workers' Compensation Commission that a claimant's senility was not the result of a work-related injury. Of significance to an evaluation of that determination is the view we take of the fact that the claimant was employed, but arguably, only because of the largesse of his employer. On appeal to the Circuit Court of Adams County, the commission was reversed. We hold that the determination of the commission was supported by substantial evidence and reverse the judgment of the circuit court.

I
Appellee, Martin Larsen, was injured when he fell on March 14, 1985, while working as a mechanic at the Natchez Equipment Company, in Natchez, Mississippi. In subsequent proceedings before the Workers' Compensation Commission, Larsen, who was 79 years old at the time of the injury, was awarded scheduled-member benefits for the injury to his left leg. The scheduled-member benefits have not been contested at any point. Furthermore, all parties stipulated to the fact that Larsen is permanently and totally disabled. The issues before the commission were (1) whether a causal connection exists between Larsen's leg injury and a separate, permanent and total disability (in this case, senility); (2) whether these permanent *272 benefits, if awarded, are subject to apportionment; and (3) whether Larsen is entitled to penalties?
Larsen called one witness  Charles Gibbs. Gibbs testified he was named conservator for Larsen on November 30, 1987. Two years before the accident, Larsen had given Gibbs power of attorney. Gibbs testified that he assumed power of attorney over his mother and his stepfather as his mother was misplacing negotiable instruments. While securing power of attorney over his mother, Gibbs testified he went ahead and took power of attorney over his stepfather. Thereafter, Gibbs paid the bills for the couple from money Larsen gave him.
Gibbs said that his efforts to gain power of attorney over Larsen were not the result of any mental failing from which Larsen may or may not have been suffering. According to Gibbs, prior to the March 1985 injury, Larsen had no mental infirmities at all. Gibbs stated that Larsen went to work every day, including Saturdays. He characterized Larsen's pre-accident behavior as normal for a person of Larsen's age. Prior to March 15, 1985, Gibbs said Larsen never exhibited any confusion and was able to care for himself. Following hospitalization for the injury, however, Larsen became unpredictable and was seen roaming the streets of Natchez. Gibbs ended up putting Larsen and his mother in a nursing home, as both individuals were roaming through Natchez during the day. Gibbs stated that Larsen never regained mental orientation for an extended period of time following hospitalization for his hip injury. As of the time of the hearing, Larsen was unable to hold a conversation. In addition, Larsen could not walk, shave, bathe or eat without assistance. Gibbs sought compensation for the money he believes Larsen was due to cover such nursing costs.
The defense called Warren Womack, president and principal owner of N.E.C., who testified he knew the claimant and the claimant's stepson/conservator. Warren testified he hired Larsen in 1949 and that Larsen retired at one point, but returned to N.E.C. part-time and on partial salary. After his return, Larsen was assigned only "light bench work," as Warren did not think Larsen was "physically or mentally capable of performing the regular duties of a mechanic." Warren stated he never talked to Charles Gibbs about Larsen's limited capacities, but that he had conversations with his brother, Gene, regarding Larsen's ability to perform. As an example of Larsen's deterioration, Warren testified that Larsen reported for work on a Sunday morning at one time, even though N.E.C. was closed on Sundays.
On cross-examination, Warren testified there was never a gap in the payroll status of Larsen even though Larsen "retired." Larsen would show up to work, even if there was not that much for him to do. Larsen worked part-time throughout 1984 and from January to March 1985 (the time of his accident).
The defense also called Gene Womack, vice president and service manager of N.E.C. Gene testified that Larsen had no duties at N.E.C. for the last three to six months preceding his accident and that Larsen could not perform mentally or physically at work as he had become very weak and forgetful. Gene stated he told Larsen it was not in his best interest to continue working at N.E.C., but Larsen insisted he be allowed to come back to work. Furthermore, Gene testified that Larsen would forget to pick up pay checks and that, at times, he would forget to come to work.
On cross-examination, Womack admitted that Larsen had no duties at N.E.C., although Larsen had his own work bench and performed small tasks under the supervision of another worker and that, even though Larsen had not been assigned any work for several months before the accident, Larsen would still show up for work and sweep the floors.
Gene testified that Larsen's injury occurred in the work area. He also testified that N.E.C. paid Larsen a salary of $12,000 in 1984, and that Larsen had an average weekly wage of $140 a week. Gene testified that Larsen was maintained on the payroll out of a sense of loyalty rather than for any work performed.
The medical testimony may be quickly summarized. Larsen called one expert: J.L. Henderson, a retired orthopedic surgeon, *273 who examined Larsen upon admission to the hospital following the fall at N.E.C. The defense called two experts: Jerry W. Iles, a family-practice specialist, who treated Larsen from July 1987 to the time of the hearing and Lucien R. Hodges, a neurosurgeon.
Although he never examined Larsen before the March 1985 fall, Henderson testified he believed the fall "contributed or mainly brought forward" Larsen's worsened mental state. He stated that Larsen was confused upon admission to the hospital. According to Henderson, Larsen's mental confusion caused 100 percent disability.
Iles testified that he had examined Larsen on a monthly basis since his confinement in a nursing home in July 1987. During his examinations of Larsen, he noticed Larsen was confused, hostile and out of control. Iles diagnosed Larsen as suffering from Alzheimer's disease. He declined to agree that there could be any causative connection between a hip injury and the onset of Alzheimer's Disease. This testimony was corroborated by Hodges (although Hodges never examined Larsen, but gave an opinion based on medical records).
The Administrative Judge entered an order denying Larsen's claim seeking compensation for his mental condition, but granting disability benefits for the injuries to Larsen's left leg caused by his fractured hip. The judge based this finding on the testimony of Gibbs that Larsen was forgetful prior to the fall, as well as the testimony from the Womack brothers that Larsen was neither physically nor mentally capable of doing his work at N.E.C. for about six months prior to the fall. The judge also found all of the medical testimony regarding the causation of Larsen's mental deficiencies "insufficient" as none of the physicians were appraised of Larsen's medical history prior to the fall.
Larsen petitioned the Mississippi Workers' Compensation Commission for review of this order. In particular, Larsen claimed (1) there is nothing in the record indicating that Larsen has been diagnosed with Alzheimer's disease; (2) the suddenness of the onset of Larsen's confusion after the injury is inconsistent with the onset of Alzheimer's disease; (3) the finding of the Administrative Judge in regard to the opinion of Dr. Henderson is based upon speculation and is, therefore, not supported by the evidence; (4) the findings of the Administrative Judge (hereinafter, ALJ) are contrary to the credible and overwhelming evidence and are, as well, contrary to law.
The Commission reviewed Larsen's petition and denied relief. Larsen appealed and the Adams County Circuit Court reversed the Commission, holding that its findings were "simply not supported by the record made in this case through either substantial or reasonable evidence, and the Full Commission Order is hereby reversed and the cause remanded to the Commission for further proceedings consistent with this Order and Opinion." N.E.C. perfected this appeal. In essence the sole issue is whether the decision of the commission is supported by the evidence.

II
Under Mississippi law, the Workers' Compensation Commission is the ultimate finder of facts in compensation cases, and as such, its findings are subject to normal, deferential standards upon review. Olen Burrage Trucking Co. v. Chandler, 475 So.2d 437, 439 (Miss. 1985). The ALJ is not the ultimate finder of fact, but rather "the individual who conducts the hearing and hears the live testimony, such as it is." Walker Mfg. Co. v. Cantrell, 577 So.2d 1243, 1245 (Miss. 1991). The Commission is free to accept or reject the ALJ's findings, so long as the Commission's actions are based on substantial evidence. Day-Brite Lighting v. Cummings, 419 So.2d 211, 213 (Miss. 1982). In the instant case, the Commission accepted the ALJ's determination that Larsen was not entitled to compensation for his mental condition.
On appeal, this Court reviews matters of law de novo, while according the interpretation of the Commission great weight and deference. KLLM, Inc. v. Fowler, 589 So.2d 670, 675 (Miss. 1991). So long as the Commission's decision contains no error of law and is based on substantial evidence, this Court will not disturb the findings. *274 Metal Trims Industries, Inc. v. Stovall, 562 So.2d 1293, 1296-97 (Miss. 1990). By the same token, when the decision of the Commission is before the circuit court on intermediate appeal, that circuit court may not tamper with the findings of fact, where the findings are supported by a sufficient weight of the evidence. Roberts v. Junior Food Mart, 308 So.2d 232, 234-35 (Miss. 1975). Where the circuit court reverses the Commission by simply supplanting its judgment for that of the Commission, without regard to whether the Commission's findings were substantiated by the weight of evidence, the circuit court commits error. Morris v. Lansdell's Frame Co., 547 So.2d 782, 785 (Miss. 1989).
Here, the ALJ determined the physicians who testified in this case did not benefit from the testimony of witnesses who had personal experience with Larsen prior to the fall. The fact that Gibbs testified that Larsen was forgetful prior to the fall, and that both Womacks testified Larsen was incapable of performing his duties at N.E.C. for no less than six months prior to the fall rendered any testimony that Larsen's mental condition was caused by the fall "insufficient."
Following affirmance by the Commission, the circuit court replaced its judgment with that of the ALJ and the Commission, finding (1) testimony from Gibbs that Larsen "had not been to a doctor for six or seven years [prior to the fall] and was on no medication at the time of the injury negates any pre-existing medical problem"; (2) the ALJ erred in finding that Larsen suffered from forgetfulness based only on the fact that Larsen showed up to work once on a Sunday; (3) the fact that Larsen was on the payroll at N.E.C. and was completing tasks commensurate with his age vitiates the ALJ's finding that he could not perform at work; and (4) the ALJ erred in setting medical testimony aside in favor of her "unfounded personal opinions[.]" These determinations by the circuit court do not go to the substantial weight of the evidence, but rather, simply exchange the judgment of the circuit court with that of the Commission. As such, and based on the above discussion of law, the order of the Adams County Circuit Court cannot stand. We, therefore, reverse the circuit court's judgment and reinstate the order of the commission.
REVERSED AND ORDER OF WORKERS' COMPENSATION COMMISSION REINSTATED.
HAWKINS, C.J., DAN M. LEE and PRATHER, P.JJ., and SULLIVAN, PITTMAN, McRAE, JAMES L. ROBERTS, Jr., and SMITH, JJ., concur.