GRIFFIS, J.,
for the Court.
¶ 1. Kimberly Allam filed a workers’ compensation claim against her employer, Waffle House, Inc., for injuries sustained when she fell while unloading boxes from a delivery truck. The Workers’ Compensation Commission held that her injury was not compensable. The Hinds County Circuit Court reversed the Commission’s decision. Waffle House appeals and argues that the circuit court’s decision was not supported by substantial evidence. We find no error and affirm. We remand to the case to the Commission for a determination of benefits.
*921 FACTS
¶ 2. In the summer of 2003, Allam was employed as a district relief manager for Waffle House. Her job was to relieve district managers on their off days. Around June 9, she was working at the Waffle House located on the 1-55 North Frontage Road in Jackson. While carrying a box from a delivery truck to the cooler, she slipped on a package of ketchup and fell and landed on her right buttock. At the time, she did not realize that she had also hurt her back as well. When the driver of the delivery truck came in, she informed him that she had just fallen.
¶ 3. When her district manager, Les Brewer, called her later that day, she informed him of the accident. The next morning, she also informed her other district manager Troy Ridgely and division manager Robert Wilbanks of the accident and injury. Ridgely and Wilbanks denied that the fall hurt her. Ridgely told her she just lacked enough potassium and needed to eat a banana. Wilbanks flippantly suggested that perhaps “wild sex” was the culprit. Allam kept reporting the injury to her managers every time she saw them and told them she was in too much pain to keep working.
¶ 4. The following Monday, June 16, Al-lam went to see Dr. C. Brent Meador with complaints of lower back pain radiating into her right buttock and posterior thigh and calf. She was eventually diagnosed with a bulging disc which was pressing on her lower right back. After non-operative treatment proved unsuccessful, she had back surgery on October 27.
¶ 5. Allam eventually quit work at Waffle House because she was in too much pain and her employer refused to give her lighter work or fewer hours. She tried a series of other similar jobs, which she proved unable to tolerate physically. There were two other jobs for which she applied, but she could not get those because she did not have an open checking account.
¶ 6. On October 20, 2003, Allam filed her petition to controvert. A hearing was held before the administrative law judge, and the only evidence presented came from Allam and her medical records. Allam’s medical records indicated that she sustained an on-the-job injury as a result of a fall and a “lifting injury” at the time she alleged. The independent medical examination concluded that Allam’s injuries were consistent with her description of the accident. Waffle House did not offer any evidence. The Commission, however, determined that Allam had not sustained a work related injury. The circuit court reversed and held that it was error to disregard Allam’s undisputed testimony.
STANDARD OF REVIEW
¶ 7. This Court’s scope of review in workers compensation cases is limited to a determination of whether the decision of the Commission is supported by substantial evidence. Westmoreland v. Landmark Furniture, Inc., 152, So.2d 444, 447(¶ 7) (Miss.Ct.App.1999). The Commission sits as the ultimate finder of fact; its findings are subject to normal, deferential standards upon review. Natchez Equip. Co. v. Gibbs, 623 So.2d 270, 273 (Miss.1993). We will only reverse the Commission’s rulings where findings of fact are unsupported by substantial evidence, matters of law are clearly erroneous, or the decision was arbitrary and capricious. Westmoreland, 752 So.2d at 448(¶ 8); Hale v. Ruleville Health Care Ctr., 687 So.2d 1221, 1225 (Miss.1997).
¶ 8. “[A] finding is clearly erroneous when, although there is some slight evidence to support it, the reviewing court on the entire evidence is left with the *922 definite and firm conviction that a mistake has been made by the Commission in its findings of fact and in its application of the Act.” J.R. Logging v. Halford, 765 So.2d 580, 583(¶ 13) (Miss.Ct.App.2000). “Where no evidence or only a scintilla of evidence supports a Worker’s Compensation Commission decision, this Court does not hesitate to reverse.” Foamex Prods., Inc. v. Simons, 822 So.2d 1050, 1053(¶ 11) (Miss.Ct.App.2002).
ANALYSIS
¶ 9. Waffle House argues that the Commission was able to determine Allam’s credibility and reject her testimony on that basis. To support this claim, Waffle House argues that Allam’s testimony was wholly uncorroborated and contradicted by the medical records. Allam disagrees, argues that her testimony was corroborated by the medical records, and maintains that it was error for the Commission to reject her undisputed evidence.
¶ 10. When the claimant’s testimony is undisputed and not so unreasonable as to be unbelievable, taking into account the factual setting of the claim, her testimony generally ought to be accepted as true. Westmoreland, 752 So.2d at 449(¶ 15). “Likewise, the Commission, sitting as judge of the credibility of the witnesses, has the authority to accept or reject testimony depending on the circumstances which demonstrates the degree of trustworthiness or credibility accompanying the testimony at issue.” Id. “Negative testimony concerning the cause of injury may be substantial evidence upon which a claim may be denied.” Id. (quoting White v. Superior Prods., Inc., 515 So.2d 924, 927 (Miss.1987)). Contradiction exists when there is affirmative evidence to the contrary. Hedge v. Leggett & Platt, Inc., 641 So.2d 9, 11-12 (Miss.1994).
¶ 11. In Westmoreland, this Court affirmed the Commission’s credibility determination and subsequent denial of benefits. Westmoreland testified that he injured his back while lifting a piece of furniture at work. Westmoreland, 752 So.2d at 446(¶ 3). He informed his supervisors and was sent to the doctor right away. Id. The Commission discredited Westmoreland’s testimony and denied his claim. Id. at 447(¶ 5). Co-workers who were working near him at the time of the alleged injury testified they did not see him hurt nor hear him complain of an injury. Id. at 449 (¶¶ 13-14). One co-worker in particular claimed that Westmoreland came in and announced he was not going to work very hard that day. Id. at (¶ 14). Soon afterwards he went on a smoke break. Id. After his smoke break is when he reported an injury to his supervisor. Id. This Court found this to be “contradicting testimony.” Id. at (¶ 15). Furthermore, West-moreland failed to tell his doctors that he had hurt his back before. Id. at 450 (¶ 18). His most recent trouble with his back occurred when he had hurt it at home a few weeks before the alleged work injury. Id. All doctors testified that taking the new information into account, they could no more attribute the injury to work than they could to the incident at home. Id. at 450-51 (¶¶ 18-20). The Court found the above evidence contradicted Westmoreland’s claim and gave substantial credible evidence to support the Commission’s decision. Id. at 451 (¶¶ 21-22).
¶ 12. In Hedge, the supreme court reversed the Commission’s denial of benefits where there was no affirmative evidence that contradicted the claimant’s proof. Hedge, 641 So.2d at 11-12. Betty Hedge and her doctor testified that she suffered from certain respiratory problems which *923 were aggravated by workplace irritants such as glue and foam dust. Id. at 10-11. Co-worker Beatrice Merritt testified that there was foam dust in their work space which would get on her own clothes and hair. Id. at 10. The only evidence proffered by the employer was the medical testimony of Dr. Robert Norwood Jones. Id. at 11. Dr. Jones testified that it was “possible but not likely” that Hedge’s condition was aggravated by her work environment. Id. He maintained there was insufficient evidence to conclude that Hedge’s injury was work related. Id. The Court held:
That testimony of Dr. Jones did not embrace evidence which contradicted Dr. Moore’s statements that Betty’s workplace environment ... contributed to her respiratory problems. Absent affirmative testimony to the contrary, Dr. Moore’s testimony remained uncontro-verted and satisfied the burden of proving a causal connection between Betty’s workplace and the exacerbation of her asthma.
Id. at 11-12. Because Dr. Jones “did not state that workplace exacerbation of Betty’s asthma did not occur,” his “testimony was deficient for purposes of rebutting the affirmative testimony of Dr. Moore.” Id. at 14. Hedge’s evidence remained uncon-troverted, and the Commission erred in denying her claim. Id. at 15.
¶ 13. Here, Allam testified that she was at work when she slipped on a package of ketchup while carrying a box to the cooler. She told the truck driver right away. She also reported the work injury to three supervisors. As a result of the fall, she testified she sustained an injury to her lower back, right buttock and posterior right thigh and calf. She stated that she did not have these injuries until the fall. Her medical records before the fall indicate no prior report of a back injury. She testified that she told Dr. Meador that it was a work injury, although she was going to go ahead and file it on her personal insurance. Dr. Meador noted that she fell, but did not indicate it was at work. In the one part of her medical records where she was specifically asked to record the cause of her injury, she marked “on-the-job injury.”
¶ 14. Allam’s medical records corroborate the approximate date and nature of her injury. In fact, the record from the independent medical examination reveals the conclusion that, “[h]er historical representation of her problems is compatible with her overall physical evaluation in that she does have loss of active lumbar reserve and also has some positive radicular changes into her right lower extremity.” This finding was sufficient to establish Al-lam’s prima facie case. The question we must answer was whether or not this finding was contradicted.
¶ 15. The Commission found that Allam did not sustain her burden of proving a work related injury because (1) she did not file a workers’ compensation claim, (2) she filed the doctor visits on her personal insurance, (3) not all of her medical records mentioned a work injury and on one medical record, she indicated this work related injury occurred on “5-03.” We examine these findings in turn.

A. Failure to file a claim

¶ 16. During oral argument, counsel for Waffle House conceded that this finding by the Commission was not enough to contradict Allam’s evidence that her injury is work related. Furthermore, there was simply no evidence to support a conclusion that Allam did not report a work injury to or file a claim with her employer. Her testimony was undisputed that she reported it to her supervisors the same day, next day and subsequent week. After her *924 managers consistently rejected her claim, Allam filed a petition to controvert approximately five months after the injury. Indeed, Allam could have waited as long as two years to file her petition to controvert. Miss.Code Ann. § 71-3-35(1) (Rev. 2000). This finding by the Commission is not supported by substantial evidence, and indeed, it has no merit.

B. Personal insurance

¶ 17. During oral argument, Waffle House conceded that this finding does not contradict the existence of a work injury. The evidence before the Commission was undisputed that she told her managers that she had suffered a work related injury, but they dismissed her out of hand. Having been denied, Allam could either opt to pay her medical providers out of her own pocket, file the charges on her personal medical insurance, or go without medical treatment altogether. Allam’s decision to file her charges with her personal Blue Cross/Blue Shield health insurance coverage corroborates her testimony that she was injured and that Waffle House had refused to pay her medical bills. Nevertheless, it does not contradict the existence of a work injury. This finding by the Commission is not supported by substantial evidence, and indeed, it has no merit.

C. Not all medical records mention a work injury

¶ 18. Unlike the preceding findings, here, Waffle House does not concede that this finding fails to contradict the existence of a work injury. Waffle House argues instead that the fact that not all medical records mention a work injury is, in fact, the substantial evidence sufficient to rebut Allam’s prima facie case. Waffle House further contends there is a “large pile of inconsistencies” in the medical records which contradict Allam’s claim.
¶ 19. A review of Allam’s medical records indicate that her claim is only corroborated and not contradicted.

1. January through May 2003

¶ 20. On January 21, February 4 and 28, March 18, April 3 and 25, and May 16 and 30, 2003, Allam visited Dr. Meador complaining only of a plantar wart.

2. June 16, 2003

¶ 21. On June 16, Dr. Meador noted that Allam reported a recent fall, “and has had back pain ever since. She actually had her appointment for ... wart.” The records indicate that the lower back pain radiated into Allam’s leg. Dr. Meador ordered an x-ray of her lumbar spine, which indicated, “mild hypertrophic changes” with narrowing at L5-S1. He scheduled her for an MRI at Central Mississippi Medical Center (“CMMC”).

3. June 17, 2003

¶22. The MRI at CMMC was performed on June 17. The CMMC admission record lists “low back pain” as the admitting diagnosis. In the “Accident” blank, the word “other” is typed in by hospital staff. There was no indication of what accidents the word “other” excluded or included. June 17, 2003, was listed as the “accident date.” The MRI revealed, “a bulging disc change at L4-5, slightly lateral at the L4-5 level on the right side, more than the left, without other inter-spaces involved.” The conclusion was “generalized bulging disc change with lateral protrusion on the right side at L4-5.”

Ip. June 18-19, 2003

¶ 23. On June 18, Allam was admitted to CMMC by Dr. Meador. She was examined by Drs. Greg Oden and Winston Ca-pel. They diagnosed her with lumbar disc displacement.
*925 ¶ 24. Attending physician Dr. Oden’s notes read:
Patient presents with low back pain.... She presents to us now complaining of several days of severe lower back pain. It has progressed particularly over the last week and now radiates down the right lower extremity. She is very uncomfortable with sitting. She is actually most comfortable standing up she states. She does have strength in the leg, but certainly complains of radicular pains that are transient. She continues to have control of bowel and bladder activity. She has been uncontrolled with Lor-tab 10 and muscle relaxants at home and therefore is admitted.
He noted that the “MRI of the spine revealed generalized bulging disc on the lateral protrusion on the right side of L4 and L5. Lumbar x-rays demonstrate partial lumbarization in the first sacral element resulting in six apparent lumbar vertebral bodies, but no evidence of acute abnormality.” He placed her on a morphine pump, and ordered a neurological and pain management consult.
¶ 25. Neurological consultant Dr. Capel records:
This patient presents with right leg pain beginning approximately one week ago. She denies numbness or weakness, bowel or bladder difficulties. The patient denies dramatic precipitation. The patient has full range of motion of the hip without pain. Straight leg-raising is weakly positive. Motor exam shows 5/5 in all groups. Sensory is intact to pin prick. MRI shows transitional segment, L5-L6 degeneration and minor prolapse without gross significant compression.
He recommended “conservative measures, Medrol dose pack, analgesics and observation with followup in four weeks.”
¶ 26. After meeting with pain management consultant Dr. Tauqeer Yousuf, Al-lam was discharged on June 19 and was prescribed Bextra, Lorcet Plus, and Me-drol.

5. June 27, 2003

¶ 27. Allam reported to Dr. Meador on June 27, “crying, hurting in lower back.” His records reveal that she was unable to sit or stand, and her leg was going numb at times. Dr. Meador referred her to neurologist Dr. Jack Moriarty and prescribed pain medicine.
¶28. Allam reported to Dr. Moriarty that same day. Dr. Moriarty’s records states:
The patient says that about a month ago she noticed pain in her right buttock and posterior thigh and leg. It did not radiate to her foot. She denies left lower extremity symptoms. She denies axial low back pain. She says that the pain is significantly increased with standing. She is currently unable to sit up evenly secondary to the pain.... She is unable to put on her shoes or socks secondary to the pain. She has treated this with Medrol, Valium, and Lorcet without durable relief.
Dr. Moriarty reviewed the June 17 MRI films and noted, “They show mild L4/L5 loss of water and a very small broad-based disc bulge. There is also moderate bilateral L4/L5 foraminal stenosis with a possible right far lateral broad-based disc bulge causing some nerve root compression. There is also the possibility of bilateral L4 ? ? [sic] fracture.” He noticed weakness in the iliopsoas, quad, and dorsiflexion in the motor exam of her right leg. He wrote that the weakness may be secondary to pain. His final assessment of Allam was, “Her MRI shows only moderate nerve root compression at L4/L5, but there is the possibility of a pars fracture and some foraminal stenosis. This could *926 account for her right lower extremity pain, as she does appear to have worse right-sided L4 nerve root compression than left.”
¶ 29. Dr. Moriarty referred Allam to Dr. Jeffrey T. Summers for pain management. She saw Dr. Summers on June 27. Dr. Summers had her fill out a Pain Management Questionnaire, on which Allam recorded that, she had an “on the job injury.” She wrote the date of injury was “5-03.” He wrote Dr. Moriarty a letter which stated:
Kimberly Allam has a one month history of lower back pain that over the past two weeks has intensified and radiated into the posterior extremities to the mid-leg. I’m able to reproduce her pain with straight leg raise testing, Faber’s testing or lumbar flexion, all of which provoke a low back and right lower extremity pain. She’s also reporting diminished sensation in the posterior thigh and calf distally to the mid calf on the right. She’s absent her right ankle reflex. Her back and leg pain suggest a radicular process.
Dr. Summers noted he would proceed with epidural injections. The medical records on this date indicate:
Kimberly Allam has a history of lower back pain since a lifting injury a month ago. Over the past two weeks her pain has begun to intensify and radiate into the right gluteal area and posterior thigh and calf to the mid calf. Her pain is aggravated with sitting or riding, and is diminished with standing or left lateral recumbency. She denies any persistent neurological changes, nor any bladder/bowel dysfunction other than that her pain is increased with a bowel movement. ... She’s able to heel and toe walk, though she has a slightly antalgic gait. She sits with her right gluteal area off-loaded, and with walking, also leans to the left. Lumbar flexion at 80 degrees reproduces her back and leg pain, though extension at 25 degrees or lateral bending provokes no discomfort. Faber’s testing and straight leg raise testing provoke her back and leg pain. She’s reporting diminished sensation in the right posterior thigh and calf, and she’s absent her right ankle reflex.... Her back and leg pain suggest a possible radicular process. Her worst pain typically involves the posterior thigh and calf in an L5/S1 dermatomal distribution. ... Though her pathology seems to be more significant at L4 and L5, her pain pattern suggests more of a possible L5 or SI involvement. I attempted a selective nerve root block, but there were no significant sensory changes after the procedure, and I did not feel that I could make any diagnostic impression based on the results of the injection.... I’ll see her back in two weeks....

6. July 1, 2003

¶ 30. Allam saw Dr. Summers again on July 1. She reported her pain as a nine out of ten. The record reflects she had numbness from her right buttock to her ankle. Dr. Summers wrote that Allam has continued having low back and right lower extremity pain. Straight leg raises and lumbar flexion both provoked low back and posterior thigh pain that extends to her knee. Reflexes of her right knee were slightly attenuated. He administered the epidural injections and advised her to increase her Neurontin.

7. July 17, 2003

¶ 31. Allam went to Dr. Summers on July 17 for epidural injections. She reported her pain as six out of ten. She reported a sensation of pins and needles from her right buttock to her right posteri- or calf. Dr. Summers’s notes read that *927 Allam reported significant improvement ■with the epidurals, and “She has a gluteal pain that now ‘skips’ her thigh to the calf.” Straight leg raises were negative. Lumbar flexion provoked gluteal pain extending to the thigh. He scheduled her return in two weeks.

8. August 5, 2003

¶ 32. Allam saw Dr. Meador again on August 5, for a one month follow-up of her back injury. He diagnosed her with a protruding disc and muscle spasms. The record from this date indicates, “However it is greatly improved since the last time we saw her secondary to a fall.”

9. August 12, 2003

¶ 38. Allam saw Dr. Summers on August 12. She reported the most pain in the last month to be a six out of ten. She described her pain as pins and needles in her right buttock, aching in her right posterior thigh, and stabbing and numbness in her right posterior calf. Dr. Summers administered epidural injections in the right L5 and SI nerve root. He diagnosed her with lumbar radiculopathy. Dr. Summers wrote to Dr. Moriarty that Allam was reporting progressive improvement in her right lower extremity pain. He wrote:
Her worst pain is in the gluteal area. Straight leg raise testing provokes a posterior knee pain, but no distal lower extremity symptoms. Lumbar flexion at 90 degrees provokes an increasing glu-teal pain, but again, no radiating component is noted. She still has an attenuated right ankle reflex, and reports slight hypesthesia in the posterior thigh and calf.
Dr. Summers stated that these were the last scheduled epidurals, and he was going to have her evaluated for physical therapy, “as a lot of her residual proximal lower extremity pain may have a muscular component as well.”

10. September 8, 2003

¶ 34. Allam saw Dr. Meador for refills of her medication. She reported that the epidural injections were not helping her back pain. “She does have a bulging disc that apparently does press on a nerve root on the right side.” “Palpation of the back shows she has considerable muscle spasm in the left and right lumbar areas, right greater than left. Straight leg test is slightly positive on the right.” He referred her back to Dr. Moriarty.

11. September 30, 2003

¶ 35. Allam returned to see Dr. Moriarty. She continued to complain of significant right lower extremity pain, with no relief from epidurals. Dr. Moriarty concluded:
I think that her lumbar MRI does show L4-5 disc degeneration which does cause moderate to severe bilateral fora-minal stenosis. There is also some slight lateral recess stenosis. I think the patient’s main problem is from her right L4 nerve root being compressed within the L4-5 foramen. However, I would like to rule out or identify preop-eratively any lateral recess compression of her L4 nerve root as well as lateral recess compression of her L5 nerve root at L4-5.
He ordered a lumbar myelogram. It revealed, “clear decreased filling of her right L5 nerve root and also the possibility of far lateral compression of her L4 nerve root at the L5 level,” as well as “clear evidence of poor filling of her left SI nerve root.” Dr. Moriarty and Allam discussed back surgery, which Dr. Moriarty ordered.

12. October 27-28, 2003

¶ 36. On October 27, 2003, Allam was admitted to River Oaks Hospital by Dr. *928 Moriarty, with an admitting diagnosis of “right L4-5 spondylosis with far lateral disc protrusion with foraminal compression of right L4 nerve root and lateral recess compression of right L5 nerve root.” In addition to weakness in her right iliopspas, quads and dorsiflexion, she showed weakness in her right EHL.
¶ 37. The medical records from this visit read, “She had myelographic evidence of compression of the right L5 nerve root within the lateral recess and the right L4 nerve root within the foramen.” Because of “failed multiple efforts at non-operative therapy,” back surgery was performed. Specifically the procedure consisted of “right L4-5 decompression with far lateral decompression and far lateral microlumbar discectomy.” She was discharged the next day and told to follow up with Dr. Moriarty in eight weeks.

IS.November S, 2003

¶ 38. Dr. Meador followed up with Al-lam after her back surgery. He recorded that she was still having some pain, but the straight leg raise test was negative.

1U- November 7, 2003

¶ 39. Allam returned to see Dr. Mea-dor, complaining of pain radiating from her right buttock to her ankle. Dr. Mea-dor diagnosed her with back and leg pain secondary to her back surgery.

15. November Up, 2003

¶ 40. Dr. Moriarty stated that Allam may return to work effective November 20, but with the restrictions of no lifting over ten pounds and no bending or twisting at the waist.

16. December 15, 2003

¶ 41. Dr. Russell L. Carlisle saw Allam on December 15. His notes report, that she “slipped and fell during summer and injured lower back.” The records note, “States her back hurts increased with prolonged standing or sitting. Patient was previously working as a Waffle House manager.” The records indicate that her surgical scar was present in the midline of L-spine. She had a fair range of motion of her L-S spine. He assessed her with lower back pain, “s/p recent lumbar surgery (due to disc damage from fall),” anxiety, and probable degenerative disc disease. He prescribed Lortab.

17. February 16, 2004.

¶ 42. Dr. Carlisle’s nurse called in prescription refills per Dr. Carlisle’s orders.

18. March 15, 2004

¶ 43. Allam saw Dr. Carlisle for a follow-up visit. He gave her the same assessment as before. He recorded that she had been walking two miles a day and the medicine was helping her a lot. She “works six days a week at Western Siz-zlin.” She exhibited good range of motion with minimal pain.

19. October 21, 2004

¶ 44. Dr. W. Jerry McCloud performed the independent medical exam on October 21, 2004. She reported the date of injury as July 1, 2003. He noted, “Ms. Allam was injured when she was putting boxes on some shelves and evidently one of the boxes fell and she lost her balance and fell pretty much on her right hip.” Dr. McCloud stated that her physical symptoms were consistent with her description of the accident. However, Dr. McCloud assumed the July 1 date is correct, and therefore thought that all of her prior visits are from different fall. He dated the injury as having first occurred prior to July 1. Neither the Commission nor Waffle House take issue with this date discrepan *929 cy given by Allam well over a year after her accident. As is clear from the record, Allam had been reporting this work related fall well before July 1, 2003.
¶ 45. In sum, Drs. Summers’s and McCloud’s medical records clearly list the injury as a work injury. Many of the other records do not indicate whether it was a work injury. However, on these records, there was never any other cause listed. Allam testified that she told some of her doctors it was a work injury, even though they did not record it. The medical records corroborate this fact. Specifically, while Allam herself wrote on Dr. Summers’s pain questionnaire that it was a work injury, no where in the notes does he mention this fact. She testified that other doctors did not ask her the origin of her injury. The evidence that her injury is work-related remains uncontradicted.
¶ 46. Finally, the Commission relied on the date discrepancy on the pain management questionnaire. On that questionnaire, Allam filled out the date of injury as “5-03.” Dr. Summers, in that same office visit, noted that the injury happened “about a month ago.” Taken together, this indicates that Allam estimated for Dr. Summers the date of her injury as occurring within the general period (May 27 through June 9) as she reported it elsewhere (June 9). All other medical records, before and after this one, give the date of injury as during the first full week of June. It is undisputed that Allam was working for Waffle House in May as well as June 2003. This discrepancy is equivocal at best and does not provide substantial credible evidence to reject Allam’s claim. Hedge, 641 So.2d at 11-12.
¶ 47. We find the Commission’s denial of Allam’s claim was not supported by substantial, credible evidence. It is undisputed that she contemporaneously and consistently reported her work injury to three supervisors, as well as doctors. She had no history of back trouble before this time. Her claim is not contradicted by the fact that she used her personal insurance to pay for her visits. Her medical records corroborate the time, nature and origin of her injury. The only discrepancy is that she one time reported the date of injury as “5-03.” As discussed above, this evidence is equivocal at best. It is not substantial credible evidence on which the Commission’s decision may be affirmed. Absent affirmative evidence to the contrary, Al-lam’s evidence remained uncontradicted.
CONCLUSION
¶ 48. We affirm the circuit court’s reversal of the Commission’s denial of benefits.
¶ 49. Allam requests that this Court determine the extent of her benefits. As with compensability, the only evidence on the extent of disability and benefits came from Allam. We remand this case to the Commission for a determination of benefits consistent with this opinion. Id. at 15.
¶ 50. THE JUDGMENT OF THE CIRCUIT COURT OF HINDS COUNTY IS AFFIRMED AND THIS CAUSE IS REMANDED TO THE MISSISSIPPI WORKERS’ COMPENSATION COMMISSION FOR A DETERMINATION OF BENEFITS. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, BARNES, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR.