# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-WC-01720-COA

**CLIFTON DALE CRAYS**                                                    **APPELLANT**

**v.**

**PSL NORTH AMERICA AND BERKLEY**                          **APPELLEES**
**NATIONAL INSURANCE COMPANY**

| | |
|---|---|
| DATE OF JUDGMENT: | 12/04/2017 |
| TRIBUNAL FROM WHICH APPEALED: | MISSISSIPPI WORKERS' COMPENSATION COMMISSION |
| ATTORNEY FOR APPELLANT: | JAMES KENNETH WETZEL |
| ATTORNEY FOR APPELLEES: | M. REED MARTZ |
| NATURE OF THE CASE: | CIVIL - WORKERS' COMPENSATION |
| DISPOSITION: | AFFIRMED: 11/13/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE LEE, C.J., BARNES AND WESTBROOKS, JJ.**

**BARNES, J., FOR THE COURT:**

¶1.     Clifton Dale Crays had a work-related accident on September 25, 2013. Although his employer, PSL North America, and its carrier, Berkley National Insurance Company (Appellees), compensated Crays for his neck injury, they denied compensability for his lower back/lumbar condition, claiming it was pre-existing and not causally related to the accident. After a hearing, the Mississippi Worker's Compensation Commission's (the Commission) administrative judge (AJ) determined that Crays's lumbar injury "arose out of and in the course of his employment." On appeal, the full Commission reversed the AJ's order, finding that "the greater weight of the medical proof fails to establish the necessary causation between Claimant's work injury and his alleged lumbar injury claim." Because the

Commission's decision is based on substantial evidence, we affirm.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

¶2. On September 25, 2013, Crays "was lifting water coolers from [a] forklift to [a] deck[,] and as [he] lifted one of the coolers[, he] felt a burning from [his] neck to [his] right shoulder and dropped the cooler." A witness confirmed that when Crays dropped the cooler, he "grabbed his right shoulder and [win]ced in pain." On the job-injury report, Crays identified the location of his injury as the neck area of his upper "front" torso. Crays was treated at Hancock Medical Center by Jamie Rutherford, NP-C. His chief complaint was "shoulder pain . . . [and r]eports picking up [a] heavy object with sudden onset of neck pain and radiation to right arm." Although Crays reported no back pain during his exam, his medical history did note "[c]hronic back pain." The medical assessment was of "cervicalgia" and "unspecified essential hypertension."

¶3. Crays had previously undergone two lumbar surgeries—one on July 14, 2009, and one on October 19, 2011—and had been taking Lortab and Soma several times daily since January 2010 to manage his pain. On September 19, 2013, days before the accident, Crays went to his neurosurgeon, Dr. Eric H. Wolfson, complaining of "increased back pain" and "neck and right arm pain." Dr. Wolfson ordered CT scans of Crays's cervical and lumbar spine; however, the scans were not performed until October 1, 2013, six days after the accident. The MRI of the cervical spine revealed "multilevel cervical degenerative changes . . . most severe at C5-6 where diffuse disc bulge, uncovertebral joint, and facet arthropathy,

2

result in effacement of the right aspect of the ventral cord, moderate central canal stenosis, moderate right, and mild to moderate left neural foraminal stenosis." The lumbar-spine MRI was compared to one from November 13, 2012, and revealed that his lumbar condition was essentially "unchanged," but the comparison did note that mild neural foraminal stenosis was "present on the left at L4-5 and bilaterally at L3-4." Dr. Wolfson diagnosed Crays with "herniated disc, cervical w/o myelopathy" and ordered physical therapy (PT) three times a week for four weeks.[1]

¶4.     Crays saw his pain-management specialist, Dr. Ramakrishna Settipalli, on October 3, noting pain in the "lower back, right side of neck and shoulder." The "history of present illness" reported:

> [G]radual onset of constant episodes of severe bilateral lower back pain, described as sharp, burning and tingling, radiating to the bilateral buttock, bilateral thigh, bilateral lower leg and bilateral foot. *Episodes started about 6 years ago. . . . Symptoms are unchanged*. Risk Factors: smoking, *but not . . . recent trauma . . .* Medical History: herniated disc(s), but not depression, DJD of back, spondylosis, malignancy, sciatica and spinal fracture. . . . ([Patient] states has right side of neck and shoulder, lower back pain). . . . [G]radual onset of constant episodes of severe bilateral anterior upper, bilateral posterior upper and bilateral anterior lower leg pain, described as stinging, radiating to the bilateral thigh, bilateral knee and bilateral lower leg. *Episodes started about 6 years ago. His symptoms are caused by no known event. . . . Symptoms are unchanged. . . .* 46 y/o [C]aucasian male c/o severe back and leg pain caused by degenerative disc disease and wear and tear referred by Dr. Wolfson. He has tried [PT] and it didn't help much. He has had cortisone shots in his back and it didn't help. He then had [two] back surgeries

---

[1] The October 2, 2013 "history of present illness" reported that Crays had continued pain in his neck and lower back, with the neck pain becoming severe after his accident. His pain was rated a six out of ten on the pain-intensity scale.

afterwards. He currently takes Lortab, Flexeril[,] and Soma for the pain and it helps a little with the pain.

(Emphasis added).[2] After reviewing the recent MRIs and conducting a physical examination, Dr. Settipalli's assessment was cervical and lumbar neuritis (L6-S1), lumbar radiculopathy (A1-L4), lumbar spondylosis, segmental dysfunction of the sacrococcygeal region, and failed back syndrome. With regard to the lumbar condition, Dr. Settipalli noted that an injection on March 6, 2013, had given Crays "relief without any complications," that Crays had hardware in his lumbar spine, and that the "[l]umbar [p]ain duration [and] intensity improved with Lortab." He recommended repeating both a sacroiliac joint injection and left greater trochanteric bursitis (GTB) injection "done on June 6th, [20]12, April 2nd, 2012 with good relief."[3]

¶5.     On January 10, 2014, Crays reported to Dr. Wolfson and complained of neck and lower back pain and that PT provided no relief. Dr Wolfson's assessment was cervical radiculitis, and the treatment plan was for a Cervical Epidural Steroid Injection (CESI).[4] On January 17, 2014, Dr. Wolfson ordered an Anterior Cervical Diskectomy and Fusion with

---

[2] This same history was included without change in Crays's records of his visits to Dr. Settipalli from November 2013 through October 2015.

[3] On October 15, 2013, Crays also consulted Dr. Basil Shah, for neck pain and numbness. Dr. Shah assessed Crays with arthritis and cervical neuritis and recommended a cervical epidural injection. The only mention of back pain was in his medical history.

[4] These are the notes from 10:58 a.m. There are also notes from 4:29 p.m. that do not refer to current lumbar or back pain. Dr. Wolfson's notes of January 13, 2014, also failed to reference lumbar or lower back pain.

instrumentation (ACDF).

¶6.     Crays filed a petition to controvert with the Commission on January 30, 2014, alleging the September 25, 2013 accident caused injury to his "[n]eck, shoulders, arms, back and legs." On March 14, 2014, Crays was given an independent employee medical examination (EME) by Dr. Terry Smith, who noted Crays's two prior back surgeries and that he routinely sees Dr. Settipalli to manage his pain. Dr. Smith further noted the presence of neck and back pain and diagnosed neck pain, shoulder pain and cervical disc displacement. Reviewing the MRI, Dr. Smith found "C5-6 disc protrusion" and recommended a CESI, or surgery, if the CESI failed to give relief.

¶7.     After Crays saw Dr. Wolfson on June 3, 2014, complaining of neck pain and pain intensity of eight of ten, the neurosurgeon ordered an ACDF for C5-6. On June 20, 2014, the AJ entered an order, noting that the Appellees admitted compensability for the cervical surgery and "all temporary total disability benefits . . . from the date of the accident through the present . . . until [Crays] reaches maximum medical improvement." After the June 2014 surgery, Dr. Settipalli examined Crays's cervical spine and the shoulder joint on July 23, 2014, and recommended an x-ray and MRI of the lumbar spine "to evaluate the source of pain." In Dr. Settipalli's September 23, 2014 notes, he recommended "considering [PT,] including deep myofascial release, deep massage, mobilization, hot moist heat, home exercise

5

program, TENS units[,] or ultrasound for his lower back [and n]eck pain if needed."[5]

¶8.　　On January 6, 2015, Crays reported severe and debilitating neck pain to Dr. Wolfson, but "[n]o back pain" was indicated in the clinical notes. Dr. Wolfson's summary reflects that compensation for post-operative PT was denied and that an MRI was needed to evaluate whether the fusion had a possible disk fragment, scar tissue, or seroma. Dr. Wolfson ordered an electromyogram and nerve-conduction study to evaluate nerve damage and referred Crays to Behavior Health for "severe depression" and "decreased quality of life secondary to injury at work."[6]

¶9.　　On May 22, 2015, Crays filed a motion for medical treatment with the Commission, alleging he continued to suffer "severe and disabling neck, shoulder, arm, back and leg pain and severe depression." On June 1, 2015, Crays reported to Dr. Wolfson "severe neck pain radiating to right greater than left upper extremity." As Crays had failed conservative management and symptoms interfere[d] with his usual daily activities," Dr. Wolfson recommended ACDF at C6-7 with instrumentation and possible removal of instrumentation

---

[5] Dr Settipalli's notes of November 24, 2014, indicate that he "did bilateral GTB injections . . . , recommend BS Injections. [Crays] complains of severe hip pain on abduction of hip joints recommended trochanteric bersa injection." On December 22, 2014, Dr. Settipalli performed a steroid injection to Crays's sacroiliac joint, right and left. A bilateral sacroiliac joint steroid injection was again performed on May 13, 2015. In his June 18, 2015 assessment, Dr. Settipalli listed "failed neck syndrome" instead of "failed back syndrome."

[6] A cervical-spine MRI was performed on February 2, 2015, and compared to the MRI of October 1, 2013, revealing stenosis "significantly improved" at C5-6. An electromyogram was performed on March 20, 2015 due to complaints "of neck pain with bilateral upper extremity pain and numbness." Everything was within normal limits.

at C5-6. Crays also complained "of low back pain with occasional bilateral lower extremity weakness." On June 24, 2015, the AJ ordered that the Appellees pay for all treatment recommended by Dr. Wolfson and Memorial Behavioral Center (for Crays's depression).

¶10. On July 7, 2015, Crays again complained to Dr. Wolfson of neck pain; the only reference to the lumbar area was: "No pain on palpation and percussion of spine. Straight leg raise test 90 degrees painless bilaterally." On July 10, 2015, Crays had the ACDF C6-7 surgery. The July 20, 2015 notes of his post-operative visit made no reference to the lumbar spine other than the same report of no pain. The physical exam at his second post-operative visit on August 24, 2015, evidenced lumbar pain on palpitation and percussion. The second assessment, after cervical neuritis, was degeneration of lumbar intervertebral disc.

¶11. In November 2015, Crays reported neck and lower-back pain to Dr. Wolfson after a "fall last week." Dr. Wolfson ordered an x-ray of the cervical and lumbar spine and an MRI of the lumbar spine "[i]n view of worsening low back pain." The MRI was performed January 4, 2016, and compared to the October 1, 2013 image. The report stated:

> Overall vertebral alignment is intact. There is mild anterior wedging of the L1 and T12 vertebral bodies, *stable from the 2013 MRI*. Vertebral body heights are otherwise maintained. The skeletal structures are otherwise intact. Lateral osteophytes are most pronounced at L2-L3 and L3-L4. [D]iscogenic sclerosis is noted at L3-L4.

(Emphasis added). The report's conclusion was "multilevel degenerative disease," but found "otherwise no acute radiographic abnormality." On January 11, 2016, Dr. Wolfson's medical assessment was "[l]umbar spinal stenosis, moderate to severe L3-4," and he recommended

7

a "L3-4 decompressive laminectomy and possible fusion with instrumentation."

¶12.   Crays filed another motion with the Commission for medical treatment on April 7, 2016.  The Appellees requested that a hearing be held on the compensability of Crays's lumbar condition.  Crays received an EME by Dr. Eric Graham on May 31, 2016, who opined that although lumbar surgery was indicated, as the MRI showed worsening stenosis, the condition was pre-existing and "not worsened by the work injury of [September 2013]."  Dr. Graham based his opinion "on [Crays's] subjective complaints at the time of the injury as recorded by all of his providers" and no change in his medications immediately following the injury.  Further, Dr. Graham noted that Crays did not mention his lower back pain becoming worse to Dr. Wolfson and that the MRI at that time "showed no real interval change from [November 2012].  There was also moderate L3-4 stenosis notes at this time."  Crays was under treatment by Dr. Settipalli for pain services for the lumbar spine at the time of the work injury, yet there was no mention of the accident or worsening of condition in those records.

¶13.   A hearing was held before the AJ on July 19, 2016, on the issue of whether Crays's lower back condition was causally related to the September 25, 2013 accident.  After the hearing, Dr. Wolfson reviewed Dr. Graham's report but was still of the opinion that the industrial accident precipitated, contributed, or accelerated the lumbar condition at L3/4, and that surgery was medically reasonable and necessary as a result of the injury Crays sustained.  No explanation was given as to the failure of his notes to reflect worsening of the lumbar spine after the accident.  The AJ entered her order on February 28, 2017, finding Crays had

8

"proven that his injury arose out of and in the course of his employment and that causal connection ha[d] been shown between the employment and the injury."

¶14. On December 4, 2017, the Commission reversed the AJ's order and dismissed Crays's lumbar-injury claim based on Crays's history of chronic back pain prior to 2013 and the lack of evidence that his lumbar condition was worsened by the September 2013 work injury. Aggrieved by the Commission's decision, Crays appeals.

## STANDARD OF REVIEW

¶15. Our review of a Workers' Compensation appeal "is limited to a determination of whether the decision of the Commission is supported by substantial evidence." *Casino Magic v. Nelson*, 958 So. 2d 224, 228 (¶13) (Miss. Ct. App. 2007). The Commission is "the ultimate finder of facts[, and] its findings are subject to normal, deferential standards upon review." *Id*. (citing *Natchez Equip. Co. v. Gibbs*, 623 So. 2d 270, 273 (Miss. 1993)). "We will only reverse the Commission's rulings where [the] findings of fact are unsupported by substantial evidence, matters of law are clearly erroneous, or the decision was arbitrary and capricious." *Id*. (citing *Westmoreland v. Landmark Furniture*, 752 So. 2d 444, 448 (¶8) (Miss. Ct. App. 1999)).

## DISCUSSION

¶16. Crays argues that the Commission's order is not supported by substantial evidence. "In order to prevail on a claim for workers' compensation benefits, the claimant must prove by a preponderance of the evidence that he suffered 'an accidental injury arising out of and

9

in the course of his employment, and a causal connection between the injury and the claimed disability.'" *Bryan Foods Inc. v. Ewing*, 127 So. 3d 280, 284 (¶18) (Miss. Ct. App. 2013) (quoting *S. Miss. Elec. Power Ass'n v. Graham*, 587 So. 2d 291, 294 (Miss. 1991)). Crays claims that "the factual circumstances and medical evidence supported a finding of a compensable injury," noting that after his lumbar surgery in 2011, he was able to return to work without limitations or restrictions until the date of his injury. He also cites Dr. Wolfson's opinion that the work injury accelerated Crays's lumbar condition.

¶17. We find there is substantial evidence to support the Commission's finding that Crays's lumbar injury was not caused by, or aggravated by, the September 2013 accident. As stated, the Commission is the "ultimate" fact-finder in a Workers' Compensation case. Before the accident, Crays had two back surgeries and had been routinely taking prescription pain medication for years for his back condition, even providing his employer with a list of those medications. Days before the accident, he saw Dr. Wolfson for increasing back pain, acknowledging at the hearing: "The stinging just seemed like it was just accelerating in my back." Additionally, he was receiving pain-management treatment from Dr. Settipalli for his back before the accident. Dr. Settipalli's medical notes from October 2013, days after the incident occurred, stated that Crays had lower back pain for six years and his symptoms were "unchanged."

¶18. Dr. Wolfson, Crays's treating physician, opined that the injury accelerated Crays's back condition. However, "Mississippi law does not require deference be given to the

10

claimant's treating physician." *Eaton Corp. v. Brown*, 130 So. 3d 1131, 1139 (¶40) (Miss. Ct. App. 2013). Dr. Graham's opinion, although acknowledging that "surgery was indicated," concluded that the worsening of the stenosis was "related to the pre-existing condition." He noted that Crays did not report any back issues to the nurse practitioner who examined him after the accident, and the MRI conducted by Dr. Wolfson in October 2013 "showed no real interval change from [November 2012]." This Court has held:

> [T]he Commission is also the ultimate judge of the credibility of witnesses."
> *Barber Seafood Inc. v. Smith*, 911 So. 2d 454, 461 (¶27) (Miss. 2005). When the evidence presented by witnesses on a particular issue is conflicting, we are not empowered to determine where the preponderance of evidence lies. *Id.* Instead, "this Court must affirm the decision of the Commission where substantial credible evidence supports the Commission's order." *Id*.

*Manning v. Sunbeam-Oster Household Prod.*, 979 So. 2d 736, 740 (¶13) (Miss. Ct. App. 2008). Because there was substantial and credible evidence to support the Commission's findings, we affirm the order.

¶19. **AFFIRMED.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., CARLTON, FAIR, WILSON, GREENLEE, WESTBROOKS AND TINDELL, JJ., CONCUR.**

11