ISHEE, P.J.,
FOR THE COURT:
¶ 1. In March 2012, Lee Manfredi suffered severe injuries after falling from three-story scaffolding while working on the construction of “Arbor Hall,” located on the campus of Mississippi State University. A dispute arose as to the identity of Manfredi’s “employer” as defined under the Mississippi Workers’ Compensation Act. Manfredi filed a petition to controvert in May 2012 with the Mississippi Workers’ Compensation Commission. Manfredi named as “employers” Harrell Contracting Group LLC (and its carrier, Zurich American Insurance Company), Antonio Mondra-gon (and his carrier, The Charter Oak Fire Insurance Company), and JKS Construction Inc. AMS Staff Leasing (and its carrier, Dallas National Insurance Co.) was added by Manfredi in an amended petition *809 to controvert. All named “employers” denied being the actual employer of Manfredi at the time of his injury. Evidentiary hearings were conducted before an administrative judge (AJ), and in February 2014, the AJ determined that Mondragon was Man-fredi’s actual and responsible employer, and that Mondragon and Charter Oak were responsible for all workers’ compensation and indemnity benefits from and after the date of Manfredi’s injuries. Mon-dragon and Charter Oak were then granted a review of the AJ’s order by the Commission, which reversed the AJ’s decision in March 2015, finding JKS to be Manfredi’s employer by virtue of its relationship with AMS and Dallas National. JKS now appeals. Finding clear error, we reverse and render.
STATEMENT OF FACTS AND PROCEDURAL HISTORY
¶ 2. In or around September 2011, Harrell was awarded a contract for the construction of a dormitory known as Arbor Hall at Mississippi State University. Harrell entered into a contract with JKS, a wood-framing contractor, to perform a portion of the work on Arbor Hall. JKS then contacted Mondragon to perform a subcontracting portion of the project’s work. JKS had also entered into an agreement entitled “Staff Leasing Agreement” on April 28, 2006, with AMS, which was in effect at the time of Manfredi’s accident. On March 3, 2012, Manfredi suffered an accidental injury arising out of and in the course of his work on the Arbor Hall project after falling from three-story scaffolding. Manfredi’s injuries resulted in him being temporarily totally disabled from the date of his accident to present day. None of the parties involved claimed to be Man-fredi’s “employer” for purposes of workers’ compensation liability and coverage.
¶ 3. Prior to Manfredi’s work on Arbor Hall, Manfredi performed work with Mon-dragon on a subcontract Mondragon entered into with JKS for a project in Cool Springs, Tennessee. During this project, JKS directly paid Mondragon for his work, who in turn' paid' Manfredi; it is undisputed that Manfredi was an employee of Mondragon and covered by Mondra-gon’s insurance- for the Tennessee project. Shortly after being awarded the Arbor Hall subcontract, Mondragon contacted Manfredi requesting Manfredi’s presence for the work to be performed in Starkville, Mississippi. Both Mondragon and Man-fredi traveled to Starkville, albeit in separate vehicles. Mondragon was to perform two separate phases of work: (1) “pop out” (or “layout”) work for wall installation; and (2) roof installation, when the project progressed to that point. Mondra-gon and JKS entered into a contract labeled as “Independent Contractor Agreement,” which held Mondragon responsible for his own employees, including providing workers’ compensation coverage.[1] The record reflects that Mondragon provided workers’ compensation coverage for the entire duration of the Arbor Hall project. Shortly after securing the subcontract with JKS, however, Mondragon left Stark-ville, while Manfredi remained.
¶ 4. JKS had previously entered into an agreement with AMS, in which AMS would provide administrative aid in the processing of payroll, taxes, unemployment, and *810 workers’ compensation benefits for any leased employees. AMS was not, however, involved in the operational aspects of. JKS’s leased employees, rendering JKS responsible for its employees’ daily activities, and safety, as well as their selection and wages. Importantly, under the agreement entered into by JKS, any individual JKS would like to lease had to complete an AMS application, which would then be submitted to AMS. Once the employee was a leased employee with AMS, then AMS would process the actual check writing to the employee. AMS’s duties, however, did not cover all of JKS’s employees—rather, only those employees AMS leased to JKS by _ virtue of the AMS lease application. Manfredi was not a leased employee from AMS, and JKS never claimed that Man-fredi was its employee. AMS also testified that Manfredi was considered Mondra-gon’s “agent on site.”
. ¶ 5. As part of. JKS’s orientation, all JKS employees, subcontractors, and subcontractors’ employees were required to complete a safety-training course. JKS maintained that it carried out these courses to comply with Occupational Safety and Health Law (OSHA) mandates. Manfredi completed the training course held for the Arbor Hall project; however, Mondragon was not present and did not participate in the. course. During the safety training, each person was given a hardhat sticker number provided by JKS. The sticker number was used to identify persons on the job site and was also used when JKS issued safety-violation citations during the course of the project, The record shows that Manfredi was issued prior safety citations from JKS for failure to properly secure himself to scaffolding,
(¶ 6. On March 3, 2012, Manfredi was injured after sustaining a three-story fall from scaffolding while performing roof work that was part of Mondragon’s subcontract with JKS. Manfredi suffered lifelong, debilitating brain injuries, and is still unable to communicate. The record reflects that Mondragon stated to his insurance carrier that Manfredi was not his employee despite purportedly admitting the opposite to a JKS project manager. Mondragon then allegedly told JKS that he had not told his insurance carrier that Manfredi was not his employee because it was clear that Manfredi was. JKS’s last list of “men on site” before Manfredi’s accident identifies Manfredi as Mondra-gon’s employee.
¶ 7. Manfredi filed a petition to controvert in May 2012 with the Commission, naming as “employers” Harrell (and its carrier, Zurich), Mondragon (and his carrier, Charter Oak), and JKS, with AMS (and its carrier, Dallas National) added later in an amended petiticm to controvert. All named “employers” denied being the actual employer of Manfredi at the time of his injury. It was subsequently stipulated that Harrell was not Manfredi’s actual employer, but could be held liable as his statutory employer; Harrell denied liability as Man-fredi’s statutory employer by virtue of terms of its subcontract with JKS requiring workers’ compensation coverage for its employees, AMS denied Manfredi was a leased employee through JKS, while Dallas National denied being JKS’s insurer in the event that JKS was determined to be Manfredi’s employer.
¶8. Manfredi filed a motion to compel medical treatment and temporary total disability benefits on June 1, 2012. After a hearing, a June 18, 2012 , order granted in part Manfredi’s motion to provide necessary medical treatment. The order required Manfredi’s medical expenses be páid temporarily in equal shares divided among Mondragon and his carrier, Harrell and its carrier, and JKS/AMS and its carrier, until Manfredi’s actual and responsi *811 ble employer could be determined. No temporary total disability benefits were awarded. On October 1, 2012, Harrell and its carrier were ordered to temporarily serve as the sole payor of the medical expenses and temporary total disability payments, with all rights to reimbursement reserved until Manfredi’s actual employer was resolved. The order also stated that an evidentiary hearing would be set to determine Manfredi’s actual employer following the conclusion of discovery. On November 5, 2012, Harrell and "Zurich filed a motion to dismiss claiming no liability as both JKS and Mondragon—the only possible employers of Manfredi—were insured and had secured workers’ compensation coverage. The AJ reserved ruling on the motion until the scheduled March'27, 2013 hearing on the merits.
¶ 9. In a February 25, 2013 telephonic conference with the AJ, all parties were instructed to correspond prior to the March 27, 2013 hearing to finalize all exhibits. The AJ also instructed all counsel that it was mandatory for each employer to have at least one representative present to testify and be subject to cross-examination. Counsel for JKS made it known that it intended to call Mondragon as the first witness. Formal notice of this hearing was sent to all parties on February 25, 2013; As scheduled, the March 27, 2013 hearing took place, where all counsel and parties were present, with the exception of Mon-dragon.' Moridragon’s counsel admitted Mondragon was aware his presence was required, but he had indicated he might not appear, yet informed neither the parties nor the AJ of his possible absence.
¶ 10. Due to Mondragon’s absence, neither he nor his counsel was permitted to offer evidence or to directly examine or cross-examine the witnesses at the 'hearing, pursuant to Mississippi Workers’ Compensation ' Commission Procedural Rule 7.[2] Furthermore,- the AJ ruled that Mondragon’s deposition testimony would not be allowed into evidence in lieu of live testimony and cross-examination.. The result of this ruling was that Mondragon, Charter Oak, and their counsel were precluded from participating in the hearing. The AJ offered Mondragon and Charter Oak the opportunity to proffer evidence, which they declined to do. Following the •hearing on the merits, Mondragon and Charter Oak filed a motion for a mistrial or reconsideration. On May 10, 2013, the AJ denied the motion. Mondragon and Charter Oak filed, a petition for review before the Commission. On December 16, 2013, the Commission unanimously affirmed the AJ’s exclusion of Mondragon and Charter Oak from the hearing, denying their petition; this order was never appealed, resulting in a’final judgment. On February 27, 2014, the AJ ruled on the merits, adducing from the evidence presented at the hearing that Mondragon was Manfredi’s actual and responsible employer.
¶ 11. On March 19, 2014, Mondragon and Charter Oak filed their petition for review to the Commission, alleging that the AJ erred by excluding Mondragon and Charter Oak from the March 2013 hearing and that the record did not support the finding that Mondragon was Manfredi’s employer. On March 4, 2015, the full Commission issued its order. In that order, the Commission reaffirmed its December 16, 2013, findings regarding the AJ’s exclusion of Mondragon and Charter Oak from the *812 hearing. Nonetheless, the Commission permitted into evidence and considered additional exhibits that had previously been stipulated to for the March 2013 hearing when all the parties believed that Mondra-gon would be present and subject to cross-examination; the Commission refused to allow Harrell or JKS to rebut the additional evidence,
¶ 12. Reviewing the evidence presented before the AJ, as well as the additional evidence previously stipulated to, the Commission found that JKS was Manfredi’s actual and responsible employer, thereby reversing the AJ’s order. Finding JKS responsible as Manfredi’s employer, the Commission then found that JKS was insured by virtue of its relationship with AMS/Dallas National. Finding clear error on the part of the Commission, we reverse and render.
STANDARD OF REVIEW
¶ 13. “The ... Commission sits as the ‘ultimate finder of facts’ in deciding compensation cases, and therefore, ‘its findings are subject to normal, deferential standards upon review.’” Pilate v. Int'l Plastics Corp., 727 So.2d 771, 774 (¶ 12) (Miss. Ct. App. 1999) (quoting Natchez Equip. Co. v. Gibbs, 623 So.2d 270, 273 (Miss. 1993)). This Court will only reverse the findings of the Commission if the findings are “clearly erroneous.” J.R. Logging v. Halford, 765 So.2d 580, 583 (¶ 13) (Miss. Ct. App. 2000) (citing Evans v. Cont’l Grain Co., 372 So.2d 265, 269 (Miss. 1979)). A finding is clearly erroneous if, “although there is some slight evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made by the Commission in its findings of fact and in its application of the [Workers’ Compensation] Act.” Id. However, “this Court reviews matters of law de novo, while according the interpretation of the Commission great weight and deference.” Natchez Equip., 623 So.2d at 273 (citation omitted).
DISCUSSION
¶ 14. In workers’ compensation cases, we have held that “[s]o long as there is substantial evidence in the record to support the Commission’s findings, this Court is obligated to affirm the Commission.” Hollingsworth v. I.C. Isaacs & Co., 725 So.2d 251, 254-55 (¶ 11) (Miss. Ct. App. 1998). The issue at hand is whether there is substantial evidence in the record to support a finding that JKS, by virtue of its relationship with AMS/Dallas National, is Manfredi’s actual and responsible employer. We find that such evidence does not exists.
¶ 15. Pertinent to the Commission’s finding that JKS was Manfredi’s actual employer was its application and analysis of the “control” and “nature of the work” tests. The Commission stated that while generally these two tests are used to determine when an individual is an employee or independent contractor, they are equally as applicable in determining which entity is Manfredi’s employer. Both tests were discussed at length in Davis v. The Clarion-Ledger, 938 So.2d 905, 908-09 (¶¶ 6, 8) (Miss. Ct. App. 2006), where this Court reiterated that “the issue of whether an individual is an employee or independent contractor is an issue of law.” Id. at 907-08(¶ 5) (citing Shelby v. Peavey Elecs. Corp., 724 So.2d 504, 506 (¶ 8) (Miss. Ct. App. 1998)).
¶ 16. The control test looks to four factors: “(1) direct evidence of right or exercise of control; (2) method of payment; (3) the furnishing of equipment; and (4) the right to fire.” Id. at 908 (¶ 6) (quoting Shelby, 724 So.2d at 507 (¶ 13)). *813 The nature-of-the-work test considers factors such as:
[T]he character of the claimant’s work or business—how skilled it is, how much of a separate calling or enterprise it is, to what extent it may be expected to carry its own accident burden and so on—and its relation to the employer’s business, that is, how much it is a regular part of the employer’s regular work, whether it is continuous or intermittent, and whether the duration is sufficient to amount to the hiring of continuing services as distinguished from contracting for the completion of a particular job.
Id. at 909 (¶ 8) (quoting Boyd v. Crosby Lumber & Mfg. Co., 250 Miss. 433, 166 So.2d 106, 110 (1964)). It is undisputed by the parties that Manfredi is considered an “employee,” as defined under Mississippi Code Annotated section 71-3-3(d) (Rev. 2011); thus, this Court must only determine by, whom Manfredi was actually employed. Reviewing the record before us in light of these two tests, we. find there is substantial evidence in the record supporting that Mondragon .was the actual and responsible employer of Manfredi.
I. Control Test
¶ 17. It is the “ultimate right of control” rather than the “overt exercise of that right” that is decisive under this prong. See Georgia-Pacific Corp. v. Crosby, 393 So.2d 1348, 1349 (Miss. 1981). In its order, the Commission found that JKS was Manfredi’s actual employer for the following reasons:
JKS in almost every aspect of this job had the right to control [Manfredi]. JKS directed [Manfredi] to what portion of the job to work on and provided [Man-fredi] with safety training. JKS provided [Manfredi] with lodging during the job. [Manfredi] was paid by JKS in regular intervals,'at a set amount, rather than by price per square foot amount. Further, JKS not only had the right to control [Manfredi]’s work, but also had the ability to suspend [Manfredi] from the job site for safety violations.
¶ 18. Reviewing the record as a whole, we disagree. The record reveals that Mon-dragon determined which subcontracts to undertake, arranged crews, and instructed those crews where to travel and what work to perform, with Manfredi supervising, managing, and directing those' crews throughout the duration of the subcontracts’ work. JKS did not negotiate subcontracts with Manfredi. Rather, JKS negotiated only with Mondragon on both the Tennessee and Arbor Hall projects. Furthermore, JKS provided the project plans for Arbor Hall to Mondragon, which were later found in Manfredi’s -vehicle. This is likely because Mondragon did not remain in Starkville after negotiating the subcontract with JKS, while Manfredi did, serving as Mondragon’s “agent on site.”
¶ 19. Paramount to our finding that Mondragon is Manfredi’s employer rather than JKS is the undisputed testimony of Jim Fleming, a project manager of JKS. Fleming testified that JKS never told Manfredi how to do any aspect of his job, and that “[Manfredi] knew how to do his job.” Adding to Fleming’s testimony, David Castro’s unchallenged testimony revealed that Manfredi was crucial' to the completion of Mondragon’s subcontracts. Castro was contacted by Mondragon directly, and hired as a crewman for the roof-installation portion of Mondragon’s work. Castro further testified that Mon-dragon put Castro in touch with Manfredi because Manfredi was supervising the Arbor Hall project for Mondragon. Castro also testified it was clear that he worked for Mondragon, and not Manfredi; rather, Manfredi would provide instruction on the work to be completed. Thus, Fleming and Castro’s testimony shows that Mondragon *814 possessed the “ultimate right of control” over Manfredi, not JKS. . i
¶20. Nonetheless, Mondragon‘asserts that JKS may have given direction or instruction as to the details of the work, thereby proving JKS is Manfredi’s employer. We disagree. JKS merely provided project plans that Manfredi utilized in the completion of Mondragon’s “layout” work, We do not find this equates to “control” over Manfredi, In Jones v. James Reeves Construction. Inc., 701 So.2d 774 (Miss. 1997), the Mississippi Supreme Court held;
[T]he mere fact that a servant is sent to do. work pointed out to him by a person . who .has made a bargain with his master does not make him that person’s servant .He does his own business in his own way, and the orders he receives simply point out to him the work which he or his master has undertaken to do
[[Image here]]
Jones, 701 So.2d at 780 (quoting Standard Oil Co. v. Anderson, 212 U.S. 215, 225-26, 29 S.Ct. 252, 53 L.Ed. 480 (1909)). Thus, any instructions or directions on the part of JKS were.“mere suggestions as to details or the necessary cooperation, where the. work furnished [was] part of a larger undertaking.” Id. at 779, Moreover, JKS had other employees for portions of the work not subcontracted to Mondragon. Therefore, we find JKS was not in control of Manfredi, as there was no master-servant relationship between JKS and Manfredi.
¶21. Looking next to the “method of payment,” we do not find JKS’s direct issuing of payments to Manfredi as conclusive that JKS was Manfredi’s employer-. This is because the record illustrates that JKS did so only at the request of Mondra-gon. Mondragon had left the construction site almost immediately after securing the subcontract with JKS. As such, Fleming testified. Mondragon requested that JKS directly pay Manfredi because Mondragon did not want to drive all the way to Stark-ville to pay Manfredi himself. Fleming’s testimony is further supported by an email from Mondragon requesting the same. JKS paid Manfredi in partial payments, or “progress payments,” based upon the wall pop-put budget agreed to by JKS and Mondragon; they were delivered to Man-fredi only at the request of Mondragon. As a result, JKS provided Manfredi with a 1099 tax form for 2011. JKS never paid Manfredi for any work other than that which was contracted for by Mondragon, and subsequently denied Mondragon’s later accommodation request for direct payment to his roofing crews. Thus, we do not find JKS’s method of .payment to Manfredi as persuasive proof that JKS was Man-fredi’s employer. .
¶ 22. Regarding the “furnishing oí equipment” prong, it is undisputed that JKS did not provide Manfredi with any equipment. Fleming testified that Manfredi arrived to the construction site with his own “essential tools,” encompassing his own hardhat, tape measures, chalk -lines, and chalk boxes. All of these essential tools' were the same tools Manfredi used for Mondragon’s Tennessee project. As such, this prong does not weigh in favor of finding JKS as Manfredi’s employer.
¶23. Lastly, under, the “right to fire” prong of the control.test, we-find that JKS did not possess the right to fire Manfredi. Mondragon asserts that .because JKS could, and did, issue safety violations to workers on the construction site, JKS had the right to fire, and thus, the “ultimate right to control” Manfredi. The record reveals that JKS issued two separate safety citations to Manfredi, one of which resulted ⅛ Manfredi’s brief suspension from the job site. In addition, the record shows that Manfredi completed JKS’s safety-orientation class, which .resulted in JKS providing *815 Manfredi with a hardhat sticker indicating such. Mondragon argues the hardhat sticker, in conjunction with the safety violations, shows that Manfredi was an employee of JKS. Again, we disagree with these contentions.
¶ 24. JKS provided the safety-orientation classes to not only JKS employees, but all its subcontractors and its subcontractors’ employees. Thus, JKS contends that it specifically contracted with Mondra-gon to ensure that he and his employees would comply with QSHA' mandates. Therefore, JKS maintained the right to ensure that JKS employees, and all other subcontractors and subcontractor employees, were complying with OSHA. Thus','the mere fact that JKS issued citations for the same problem (i.e., failure to securely affix one’s self to scaffolding) that led to Man-fredi’s accident does not sufficiently prove JKS had the right to fire Manfredi. There is no evidence in the record showing that JKS hired Manfredi, and therefore, we find that JKS did not have the right to fire him. As such, an application of the control test shows there is substantial evidence indicating that Mondragon is Manfredi’s employer, not JKS.
II. Nature-of-the-Work Test
¶25. As we do under the control test, we find that application of the nature-of-the-work test reveals that JKS was not Manfredi’s actual employer. The record shows that Manfredi was performing Mon-dragon’s work. Mondragon was specifically hired to perform pop-out installations for walls and roofing, which was Mondragon’s specialty. That JKS had to subcontract out this portion of the work rather than having other JKS employees, perform the work evidences the fact this was considered “skilled” work or a “separate calling,” See Davis, 938 So.2d at 909 (¶ 8) (quoting Boyd, 166 So.2d at 110).
. ¶ 26. Furthermore, we find that nothing in the record shows that Manfredi "had: a “continuous”, relationship with JKS. Mon-dragon’s work on the Arbor Hall project was a “contract for.the completion of a particular job”; that is, the layout, or pop-out, installations for the walls and roofing of Arbor Hall. Manfredi was there only at the request of Mondragon, and to ensure that Mondragon’s “particular job” was completed. In light of these facts, we find that JKS was not Manfredi’s employer.
III. Due-Procéss Issues
¶ 27. Lastly, Mondragon asserts that his due-process rights were violated by the AJ’s ruling barring his and Charter Oak’s participation in the March 27, 2013 hearing on the merits. However, we decline to address this issue. During the March 27 hearing, the AJ invited Mon-dragon and Charter Oak’s counsel to make a proffer of evidence at the request of Manfredi’s counsel; Mondragon and Charter Oak refused to do so. Where a party fails to proffer testimony or evidence when provided with an opportunity to do so, the party waives those issues for appellate review. See Blackmon v. State, 803 So.2d 1253, 1258-59 (¶ 27) (Miss. Ct. App. 2002). As such, Mondragon and Charter Oak are procedurally barred from raising this issue on appeal. See id.
CONCLUSION
¶ 28. In sum, we find reversible error on the part of the Commission in finding that JKS was Manfredi’s employer, 'as there was not substantial evidence in the record to support this conclusion. Application of the “control” and “nature of the work” tests reveals that Mondragon was Manfredi’s actual and responsible employer. The Commission’s ruling was clearly erroneous, and therefore, we reverse and render.
*816 ¶ 29. THE JUDGMENT OF THE MISSISSIPPI WORKERS’ COMPENSATION COMMISSION IS REVERSED AND RENDERED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEES.
LEE, C.J., IRVING, P.J., CARLTON, FAIR, JAMES AND GREENLEE, JJ., CONCUR. GRIFFIS, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. WILSON, J., DISSENTS WITHOUT SEPARATE OPINION. BARNES, J., NOT PARTICIPATING.

. Specifically, the contract stated: "I [ (Mon-dragon) ] am an independent contractor and I am responsible for my own employees. I hereby agree that I am/will be responsible for employees and my own Social Security, Medicare, [fiederal and [s]tate withholding taxes along with any appropriate workers’ compensation and/or liability insurance needed for your above stated name ... [and] will comply with the requirements of the Federal Occupational Safety and Health Law.’’

. Procedural Rule 7 reads as follows: “Should a party fail to appear at a scheduled hearing, the Administrative Judge on his or her motion, or on a motion of an appearing party, may dismiss the case or award compensation upon presentation of proper proof.” Miss. Admin. Code § 20-2-1:2.7.